UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
v.                               )        Criminal Action
                                )        No. 16-10096-PBS
AARON MOTT-FRYE,                 )
                                )
                Defendant.       )
_____)

**MEMORANDUM AND ORDER**

April 26, 2017

Saris, C.J.

**INTRODUCTION**

Defendant Aaron Mott-Frye, charged with drug trafficking on
Cape Cod, moves to suppress evidence seized by the government
during a car stop. He claims he was illegally stopped, detained,
and searched in violation of his Fourth Amendment rights. A
hearing was held. Three witnesses testified at the hearing on
behalf of the government: John Hayes, Special Agent with the
Bureau of Alcohol, Tobacco, Firearms, and Explosives; Matthew
Blondin, police officer with the Barnstable Police Department;
and Matthew O'Brien, police officer with the Sandwich Police
Deparment. Mott-Frye's Motion to Suppress (Docket No. 348) is
**DENIED**.

**FINDINGS OF FACT**

## I.   **The Investigation**

State and federal authorities began an investigation into drug trafficking activity on Cape Cod in early 2015. Based on intercepted cell phone calls and controlled purchases of heroin and cocaine, law enforcement officials concluded that three individuals -- Christopher Wilkins, Christian Chapman, and Denzel Chisholm -- were the leaders of a Cape Cod based drug trafficking organization (DTO). The DTO distributed large quantities of heroin, cocaine, and fentanyl to lower-level drug dealers throughout the Cape Cod area.

Investigators observed Defendant interacting with members of the alleged DTO and learned that Defendant was communicating with members of the DTO by phone. During the time of the court-authorized wiretaps, primarily between August 2015 and April 2016, there were 426 contacts between Defendant and other members of the DTO. The government believed that Defendant was a potential source of narcotics for the DTO.

On October 22, 2015, Defendant exchanged text messages with Chapman, and shortly thereafter, at approximately 5:48 p.m., officers observed Defendant arrive at Chapman's house in Yarmouth. About three minutes after arriving, Defendant and Chapman left the residence in Defendant's car. Defendant dropped off Chapman at 18 Bodfish Place in Hyannis, MA, a residence

2

maintained by Chapman as a drug stash house for the DTO. During this same time, an unindicted co-conspirator texted Chapman asking for cocaine ("white"). After Chapman arrived at 18 Bodfish place, Chapman sent him a text stating "at spot." The officers then observed the unindicted co-conspirator arrive at 18 Bodfish Place.

On November 4, 2015, investigators were conducting surveillance of Chapman when they observed Defendant pickup Chapman and drive to 21 Seabrook Road in Hyannis, the home of a known gang member. Investigators believed this to be a location used by members of the DTO, especially Chapman, to sell drugs.

On December 5, 2015, Defendant met Chapman at United Barbershop in New Bedford, MA. Based on surveillance conducted in this investigation and information learned in previous investigations, the government believed that someone at United Barbershop was a source of supply. Defendant drove Chapman back to Chapman's house at 2 Roberta Drive where they parked on the street at approximately 9:44 p.m. Then, via video surveillance, investigators observed Defendant hold up and pass a knotted bag containing "something white" to Chapman, which they believed contained narcotics. After the exchange, Chapman went inside his house and Defendant went back to Wareham.

On January 26, 2016, investigators intercepted a phone call between Wilkins and Defendant in which they were arranging a

sale of 500 grams of cocaine. The government had conducted a number of controlled buys from Wilkins. After a string of text messages discussing the deal, investigators then observed Defendant arrive at Wilkins' house, stay for a short period of time, and leave. Approximately two hours later investigators observed Chisholm, whom they believed to be the purchaser of the drugs, arrive at Wilkins' house. Investigators believed Wilkins was acting as a middle man for the sale between Defendant and Chisholm.

Based on the observation of Defendant's activities on January 26, 2016, Magistrate Judge Judith Dean found probable cause to believe that Defendant was engaged in drug trafficking and on February 2, 2016, Judge Dein issued a tracking warrant for Defendant's vehicle and a "ping" warrant for Defendant's telephone.

Between the end of January and the beginning of March 2016, Defendant was not picked up on any of the wiretaps or observed interacting with the DTO. The government learned that during this period of silence Defendant was out of the country in Egypt for about three to five weeks.

## II.   **The Stop**

On March 10, 2016, investigators were conducting surveillance at Christopher Wilkins' former residence, 263 Sudbury Street in Hyannis, MA. That day, investigators

intercepted text messages between Defendant and Wilkins indicating they were planning to meet. At around 2:58 p.m., an officer observed a car belonging to Wilkins and a car belonging to Defendant's girlfriend parked in the driveway of 263 Sudbury Street. Based on surveillance of the residence and multiple controlled purchases conducted at that location, investigators believed Wilkins and Chisholm used the house at 263 Sudbury to conduct drug deals. The house was used for no other purpose than for drug activity. At 4:20 p.m., the officers saw Defendant leave the residence in Defendant's girlfriend's car.

At roughly 4:35 p.m., Officer Matthew E. Blondin of the Barnstable Police Department saw Defendant driving on Route 132 in Hyannis while he was on patrol. Blondin was not personally familiar with Defendant, but he was part of the underlying investigation of co-defendants Chisholm, Chapman, and Wilkins, and was well-familiar with their drug-trafficking activities on the Cape.

Investigators asked Blondin to stop Defendant's car. Even though the investigators believed they had probable cause to pull Defendant over and search his vehicle for drug trafficking, Blondin was told to find a reason to pull over Defendant so as not to compromise the ongoing investigation. Defendant changed lanes without using a turn signal. After observing the violation, Blondin initiated a traffic stop.

Upon approaching the vehicle, Blondin asked Defendant for his identification. Having observed Defendant reach for something in the center console, Blondin asked Defendant to step out of the car for safety reasons because the narcotics investigation indicated the DTO was a violent and armed gang. Blondin frisked Defendant looking for weapons. None were found. At some point, Detective Foley, Blondin's partner, arrived.

Blondin also searched the area of the passenger compartment of the vehicle that had been in Defendant's reach. Blondin observed in plain view on the center console a wallet containing a large stack of cash: the top bill was a newer $100 bill. He suspected this money was from the drug deal that had just transpired.

After finishing the pat frisk of Defendant and the passenger compartment of the car, Blondin reported his findings and a drug-detecting canine was sent to the scene. This decision to detain Defendant until the canine arrived was based on Defendant's long-time involvement with the DTO, the large quantity of money found in Defendant's possession, and most notably, the belief that Defendant had just engaged in a drug deal at 263 Sudbury with Wilkins. Detective O'Brien, a canine officer with the Sandwich Police Department, arrived with a drug detection dog, Koda, at approximately 5:00 p.m. It took about fifteen to twenty minutes for the canine to arrive.

6

III.   __Nosing Around__

Detective O'Brien walked Koda around the vehicle and she "alerted" to the left rear quarter panel of the vehicle and trunk area. Koda also inspected the front passenger area of the vehicle, and showed a "final response" to the cup holder which had the wallet in it. Koda then sniffed Defendant. Just prior to the sniff, Defendant informed Detective O'Brien he had recently been around someone who had been smoking marijuana. Koda showed a heavy odor "alert" at Defendant's waist area and his left pocket. Additional currency was found in Defendant's left pocket.

According to O'Brien, there is a difference between an "alert" and a "final response." An "alert" is indicated by a change in behavior such as sniffing more intensely, slowed walking, or drooling. O'Brien interprets this change in behavior as a "small cue" that signifies there is an odor with which the dog is familiar. For example, Koda will "alert" to Inositol because she frequently smells it when it is mixed with cocaine, but she won't come to a "final response" and touch her nose to it if there is no cocaine mixed with it. A "final response," where Koda sits and touches her nose to an area, indicates the presence of a narcotic.

After Koda finished sniffing around, Blondin searched the vehicle. In the trunk of the car Blondin found a duffle bag that

contained Inositol, a common cutting agent used in cocaine distribution, and two boxes of sandwich bags. Officers seized the Inosotil and the sandwich bags. No narcotics were found during the search.

Defendant was also found to be in possession of $800. The money was not seized.

## IV.   <u>Texting</u>

At the same time the traffic stop was taking place, around 4:40 p.m., investigators intercepted a number of text messages from Wilkins indicating he recently acquired cocaine. These text messages were sent to at least nine separate individuals, all of whom were known drug customers. For example, on March 10, 2016 at 4:41 p.m., Wilkins texted Anthony Hall, a co-defendant, "gtn candy" and three minutes later, Wilkins wrote to uncharged co-conspirators "gtn work too." At 4:46 p.m., Wilkins wrote to charged co-conspirator Stephanie Davis "Gtn c too." The terms "candy," "work," and "c" are common references to cocaine. Investigators believe that since Defendant had just left Wilkins' residence, Defendant was the one who had supplied Wilkins with the cocaine that Wilkins was now marketing for distribution via text message. Agents were intercepting these text messages and relaying them to the Barnstable Police Department in real time.

## DISCUSSION

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968)). The Fourth Amendment allows law enforcement to stop a moving vehicle without a warrant and for less than probable cause if there is reasonable suspicion that crime is afoot. Arvizu, 534 U.S. at 273-74 (evaluating whether there was reasonable suspicion for a stop under the "totality of the circumstances").

I find that the police had reasonable suspicion of drug trafficking sufficient to pull over Defendant's vehicle. Reasonable suspicion is an "intermediate standard" below that of probable cause that simply requires "more than a naked hunch that a particular person may be engaged in some illicit activity." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). Agents had been investigating the DTO for over a year at the time of the stop and Defendant was repeatedly seen and in communication with members of the DTO. The day of the car stop, agents observed Defendant meet with Wilkins, a known drug dealer, at a home that was used solely for drug activity. Communications between Defendant and Wilkins intercepted by

9

agents indicated the purpose of the meeting was the sale of cocaine. When Defendant's car was pulled over, he had just left the location of the meeting reasonably believed to be a drug deal.

While Blondin did not personally intercept these calls or make these observations, agents on the case called Blondin and told him of their observations and Defendant's projected route home. This information can be imputed to Blondin under the principle of collective knowledge. United States v. Barnes, 506 F.3d 58, 62-63 (1st Cir. 2007) ("We have recognized that reasonable suspicion or even probable cause can be established by the 'collective knowledge' or 'pooled knowledge' principle."). Additionally, while not personally familiar with Defendant, Blondin was familiar with Chisolm, Chapman, and Wilkins and their drug trafficking activities on Cape Cod. This information, taken collectively, sufficiently establishes reasonable suspicion to pull the car over and conduct an investigative stop of the car. Arvizu, 534 U.S. at 273 ("[I]n brief investigatory stops of persons or vehicles, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" (quoting Sokolow, 490 U.S. at 7)).

I also conclude the police had probable cause to search the car for evidence of drug trafficking. The "automobile exception"

to the Fourth Amendment's search warrant requirement provides
that "[i]f there is probable cause to believe a vehicle contains
evidence of criminal activity, agents can search without a
warrant any area of the vehicle in which the evidence may be
found." United States v. Polanco, 634 F.3d 39, 42 (1st Cir.
2011). "Probable cause exists where the 'facts and circumstances
within their (the officers') knowledge and of which they had
reasonably trustworthy information (are) sufficient in
themselves to warrant a man of reasonable caution in the belief
that' an offense has been or is being committed." Brinegar v.
United States, 338 U.S. 160, 175 (1948) (alterations in
original) (citing Carroll v. United States, 267 U.S. 132, 162
(1925)).

Even if the police only had reasonable suspicion to conduct
the initial traffic stop, information obtained after the initial
stop provided probable cause to search the car, including the
trunk. Several factors warrant this outcome.

First, the text messages. At the same time the traffic stop
was conducted, agents working in the wire room intercepted live
text messages from Wilkins that were being sent to known buyers.
These messages indicated that Wilkins had just come into
possession of cocaine. These text messages further confirm that
the suspected drug deal between Defendant and Wilkins did in
fact happen and there would be evidence of criminal activity in

the car. <u>Polanco</u>, 634 F.3d at 43 ("probable cause only requires a fair probability -- which is well-short of certainty -- that evidence of criminal activity will be found in a particular place" (describing <u>United States v. Woodbury</u>, 511 F.3d 93, 97-98 (1st Cir. 2007))).

Second, the money. Blondin, during the initial stop of the vehicle, asked Defendant to step outside the car for safety reasons and patted-down Defendant. Blondin also performed a protective sweep of Defendant's immediate area inside of the vehicle. <u>Michigan v. Long</u>, 463 U.S. 1032, 1049-50 (1983) (if an officer has reasonable suspicion that the person stopped may be dangerous, he can pat them down and search "the passenger compartment of an automobile"); <u>United States v. McGregor</u>, 650 F.3d 813, 820 (1st Cir. 2011) ("[I]f [an officer] has some articulable, reasonable suspicion that the persons stopped may be dangerous, he can pat them down and search the car's interior -- including closed compartments -- for weapons that they could quickly lay their hands on."). The pat-down search and the protective sweep were justified by the DTO's reputation as a violent and armed gang and Blondin's observation of Defendant reaching into the center console area as Blondin approached the vehicle. During this protective sweep, Blondin observed a wallet in plain view that contained a large sum of money, the first bill being a new $100 bill. It was reasonable to believe this

large sum of money was proceeds from the recent drug deal between Defendant and Wilkins. At this point, the observation of the money together with the text messages provided sufficient probable cause to search the entire vehicle.

Third, the dog sniff. Koda "alerted" to the left rear of the car and trunk of the car suggesting there was a scent with which she was familiar. As described by the dog handler, Officer O'Brien, an "alert" does not provide more than a "small clue" because it does not indicate what the dog smelled. Still, it was consistent with the other information available to the police. Moreover, Koda alerted to the waistband and front left pocket of Defendant's pants.

Defendant argues that the officers impermissibly prolonged the stop. "[A] dog sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures." Rodriguez v. United States, 135 S. Ct. 1609, 1612 (2015) (citing Illinois v. Caballes, 543 U.S. 405 (2005)). However, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Id. This traffic stop was not unduly delayed to await the arrival of the canine unit. As stated earlier, at a minimum, reasonable suspicion existed to stop the car initially and information learned during the course of the traffic stop transformed that

reasonable suspicion into probable cause to bring the dog into the car and search the car and the trunk.

Since there was probable cause that evidence of criminal activity would be found in the car, the automobile exception to the warrant requirement allowed the officers to search Defendant's car, including the trunk.

**ORDER**

The Court **DENIES** Defendant's motion to suppress (Docket No. 348).

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge